**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:19-CR-43** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **SAQUEENA WILLIAMS and** | : | |
| **NYREE LETTERLOUGH,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Defendants Saqueena Williams and Nyree Letterlough move the court to sever trial pursuant to Federal Rule of Criminal Procedure 14. Williams further moves to suppress evidence obtained during the search of two residences made pursuant to search warrants, and evidence obtained from five cell phones. For the following reasons, we will deny both motions.

## I.   Factual Background & Procedural History[1]

On February 1, 2018, police arrested Saqueena Williams after setting up a "controlled buy" coordinated by Trooper Shawn Panchik of the Pennsylvania State Police. (Doc. 63 ¶ 41; Doc. 69 at 6). That same day, state police obtained and executed search warrants for three residential addresses in the Harrisburg, Pennsylvania area: 1936 Rudy Road, 1855 Bradley Drive, and 2147 Kensington Street. (Doc. 69 at 6; Doc. 63-1). The warrants sought, *inter alia*, controlled substances, drug paraphernalia, cell phones, cash, and firearms. (Doc. 63-1 at 13-16,

---

[1] The following facts derive primarily from Williams' submissions in support of her motion to suppress evidence. (See generally Docs. 63, 63-1, 63-2).

29-32).  Trooper Panchik provided the affidavit of probable cause in support of the warrants, (see id. at 2-16, 19-31).[2]  During the searches, state troopers seized, among other items, firearms, marijuana, cocaine, drug-trafficking paraphernalia, bulk currency, and numerous cell phones.  (See id. at 17, 33; Doc. 69 at 7).  Those items formed the basis of the instant charges.

In January 2019, a federal grand jury returned an 11-count indictment charging Williams and Letterlough with conspiracy to distribute cocaine, cocaine base, and marijuana, 21 U.S.C. § 846 (Count 1); two counts of possession with intent to distribute cocaine and cocaine base, 21 U.S.C. § 841(a) (Counts 4, 7); three counts of possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c) (Counts 5, 8, 11); two counts of possession of a stolen firearm, 18 U.S.C. § 922(j) (Counts 6, 9); and possession of a firearm with an obliterated serial number, 18 U.S.C. § 922(k) (Count 10).  (Doc. 3).  Williams was also charged with two counts of distribution of cocaine, 21 U.S.C. § 841(a) (Counts 2, 3).  (Id. at 4-5).  Williams and Letterlough pled not guilty.  (See Docs. 18, 25).  Williams subsequently moved, through appointed counsel, to sever her charges from Letterlough's and to suppress evidence from the searches of Rudy Road and Bradley Drive.  (See Doc. 63).

_____

[2] The affidavits of probable cause submitted in support of the search warrants for both 1936 Rudy Road and 1855 Bradley Drive are identical in all materials respects, save for the addresses to be searched.  The affidavit in support of the search warrant for 2147 Kensington Street was not contested and has not been submitted, but the government confirms it was also identical.  (See Doc. 69 at 6).  We refer to the affidavit, as the parties do, in the singular form.

Letterlough also filed a motion to sever, incorporating Williams' arguments. (<u>See</u> Doc. 62).

On October 22, 2020, the court held a suppression hearing. (<u>See</u> Doc. 66). Following the hearing, counsel submitted supplemental briefing, and the motions are now fully briefed. (<u>See</u> Docs. 64, 69, 73, 76, 79). The court will address both pending motions herein.

## II.   <u>Discussion</u>

Williams and Letterlough together argue that they will be prejudiced by a joint trial. Williams separately seeks suppression of items seized during the searches at Rudy Road, Bradley Drive, and Kensington Street. We first address the joint motion.

### A.   **Motion to Sever**

"There is a preference in the federal system for joint trials of defendants who are indicted together." <u>Zafiro v. United States</u>, 506 U.S. 534, 537 (1993); <u>see also</u> <u>United States v. Lore</u>, 430 F.3d 190, 204-05 (3d Cir. 2005). The Third Circuit Court of Appeals has explained that this joinder policy "promote[s] efficiency and serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." <u>Lore</u>, 430 F.3d at 204-05. The Federal Rules of Criminal Procedure reflect this liberal joinder policy. See Fed. R. Crim. P. 8, 14.

Rule 8(b) allows the government to charge two or more defendants in the same charging document "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Rule 8(b) does not require that all defendants be

charged in all counts for joinder to be proper.  Id.; see United States v. Eufrasio, 935 F.2d 553, 567 (3d Cir. 1991).  When all defendants are alleged to have participated in a single criminal conspiracy, a joint trial on the conspiracy charge and substantively related counts "aid[s] the finder of fact in determining the full extent of the conspiracy and prevent[s] the tactical disadvantage to the government from disclosure of its case."  United States v. Voigt, 89 F.3d 1050, 1094 (3d Cir. 1996) (citations omitted).

Under Rule 14, the trial court may sever properly joined defendants when joinder "appears to prejudice a defendant or the government."  FED. R. CRIM. P. 14(a).  A court will sever charges for trial "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539; United States v. Urban, 404 F.3d 754, 775 (3d Cir. 2005).  The mere fact that the government may introduce evidence of other crimes against one defendant does not entitle a codefendant to a severance.  See United States v. McGlory, 968 F.2d 309, 340 (3d Cir. 1992).  Indeed, even when "the evidence against one [defendant] is more damaging than that against another," our court of appeals favors a joint trial. United States v. Ward, 793 F.2d 551, 556 (3d Cir. 1986); see Lore, 430 F.3d at 205 (quoting United States v. Somers, 496 F.2d 723, 730 (3d Cir. 1974)).

A defendant seeking a severance faces a "heavy burden."  Urban, 404 F.3d at 775; United States v. Avila, 610 F. Supp. 2d 391, 398 (M.D. Pa. 2009).  To obtain a severance, a defendant must demonstrate prejudice so "clear and substantial" as to result in an unfair trial.  See United States v. Riley, 621 F.3d 312, 335 (3d Cir. 2010)

(quoting <u>McGlory</u>, 968 F.2d at 340).  Clear and substantial prejudice exists when a jury would be unable "to compartmentalize the evidence as it relates to separate defendants."  <u>United States v. Davis</u>, 397 F.3d 173, 182 (3d Cir. 2005); <u>Avila</u>, 610 F. Supp. 2d at 397 (quoting <u>Lore</u>, 430 F.3d at 205).  Even when a defendant succeeds in establishing prejudice, the decision whether to sever the defendant's case rests in the sound discretion of the trial court.  See <u>Zafiro</u>, 506 U.S. at 538-39; <u>see also</u> <u>Lore</u>, 430 F.3d at 204-05.

When a defendant argues that prejudice will result from the inability of codefendants to provide exculpatory testimony in a joint trial, our court of appeals has enumerated four factors to consider: "(1) the likelihood of co-defendant's testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying co-defendants could be impeached; and (4) judicial economy."  <u>Davis</u>, 397 F.3d at 182-83 (quoting <u>United States v. Boscia</u>, 573 F.2d 827, 832 (3d Cir. 1978)).  "Bare assertions" of promised testimony are not enough, and judicial economy counsels against separate trials.  <u>Boscia</u>, 573 F.2d at 832, 833.

In the matter *sub judice*, Williams and Letterlough argue that they will suffer prejudice from a joint trial because they will be unable to call each other to testify regarding contraband seized from Kensington Street.  (<u>See</u> Doc. 62 ¶ 3; Doc. 63 ¶¶ 8-11; Doc. 64 at 6-7).  Williams avers (and Letterlough confirms) that Letterlough will testify on her behalf, and state that Williams "had no knowledge" of a Smith & Wesson firearm recovered from Letterlough's residence on Kensington Street. (Doc. 63 ¶¶ 10-11; Doc. 62 ¶ 3).  Letterlough claims that Williams will return the favor, testifying that Letterlough "had no knowledge of or possessory interest in"

the drugs found at Kensington Street.  (Doc. 62 ¶ 3).  Williams, however, does not promise to testify on Letterlough's behalf.

Under the Boscia factors, neither Williams nor Letterlough has carried her respective burden.  As an initial matter, these statements by the codefendants do not rise above "bare assertions" of potential testimony.  See Boscia, 573 F.2d at 832. Williams has not even averred any willingness to testify for Letterlough. Accordingly, the first factor does not favor severance.  If taken at face value, however, this potential testimony would be exculpatory; thus, the second factor favors severance.  Nevertheless, such testimony would also very likely be impeached under the third factor, as the government confirms.  (See Doc. 69 at 26). Williams and Letterlough are cousins and are accused of being business partners in a long-running conspiracy to traffic cocaine and marijuana in the City of Harrisburg.  Williams also acknowledges that Letterlough has previous *crimen falsi* convictions that would further undermine her potential testimony.  (See Doc. 63 ¶ 13; Doc. 64 at 6).  Accordingly, the third factor counsels against severance.

Finally, considerations of judicial economy confirm that a joint trial is appropriate for these defendants.  Williams and Letterlough are charged together on nine of the 11 counts in the indictment.  Other than two drug-distribution charges against Williams, neither of which are the subject of Letterlough's potentially exculpatory testimony, the defendants face identical charges.  Judicial economy particularly favors a single trial here, as Williams and Letterlough are "charged with a single conspiracy."  See Johnson v. Tennis, 549 F.3d 296, 302 (3d Cir. 2008) (citing United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991)).

In light of the above analysis, the court concludes that both Williams and Letterlough have failed to sustain the "heavy burden" to demonstrate prejudice justifying severance under Rule 14(a).  See Urban, 404 F.3d at 775.  Letterlough's and Williams' motions to sever will be denied.

**B.    Motion to Suppress**

Williams' suppression motion consists of two arguments. Williams first argues the affidavit used to obtain warrants to search Rudy Road and Bradley Drive did not contain sufficient indicia for a magistrate to find probable cause.  Williams argues the affidavit contained stale information, no information about confidential informant ("CI") reliability, and no nexus between the residences and the alleged crimes.  She further argues that the warrants themselves were "so lacking in indicia of probable cause" that the officers who executed them could not have relied on the warrants in good faith.  (Doc. 63 ¶¶ 26-47; Doc. 64 at 7-12; Doc. 73 at 23-26).

In her original motion and brief, Williams also argued that any information recovered from cell phones seized from the Bradley Drive location should be suppressed.  Williams argued that the February 2018 search warrant for Bradley Drive failed to identify specific cell phone content, and the April 2018 cell phone search warrant only covered cell phones seized from Kensington Street.  (See Doc. 63 ¶¶ 48-51; Doc. 64 at 10-14, 16).  Williams now shifts focus to the Kensington Street cell phones themselves.  She argues that she has a privacy interest in five of the six cell phones seized from Kensington Street, and that the evidence obtained from those five phones should be suppressed because the cell phone warrant was void as

a general warrant. (See Doc. 73 at 10, 13-22; Doc. 73-1 ¶¶ 14-17; Doc. 79 at 7-10). We address each aspect of Williams' suppression motion in turn.

### 1. *Probable Cause for the Rudy Road and Bradley Drive Search Warrants*

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). When searching a home, the constitutional default is that a warrant is required. See Payton v. New York, 445 U.S. 573, 586 & n.25 (1980) (citations omitted). To issue a search warrant, a neutral magistrate must find that, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Courts reviewing such determinations do not make a *de novo* probable cause assessment; they "simply [] ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." United States v. Miknevich, 638 F.3d 178, 182 (3d Cir. 2011) (second alteration in original) (quoting Gates, 462 U.S. at 238-39).

Probable cause is an amorphous concept. Ornelas v. United States, 517 U.S. 690, 695-96 (1996). It is "not readily, or even usefully, reduced to a neat set of legal rules." Id. (quoting Gates, 462 U.S. at 232). Its existence must be determined from the view of the officer on the street, not the judge in the courtroom. United States v. Sokolow, 490 U.S. 1, 7-8 (1989); see also United States v. Cortez, 449 U.S. 411, 418 (1981). Whether probable cause exists is an *objective* determination based on the totality of the circumstances present at the time of the challenged governmental

conduct.  See United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005).

Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014).

The probable cause inquiry also considers whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.  If the affidavit fails to establish a nexus between the crime alleged and the place to be searched, the Fourth Amendment precludes the search.  United States v. Stearn, 597 F.3d 540, 558 (3d Cir. 2010).  The nexus inquiry is a "common-sense" assessment based on all facts averred in the affidavit, and no particular factor is controlling.  Id. at 554 (quoting Gates, 462 U.S. at 238).  The magistrate may make "normal inferences about where a criminal might hide [evidence or contraband]." Id. at 554 (quoting United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)).  In drug cases, "it is a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences." Stearn, 597 F.3d at 558; United States v. Burton, 288 F.3d 91, 104 (3d Cir. 2002) (same); United States v. Hodge, 246 F.3d 301, 306 (3d Cir. 2001) (same); United States v. Whitner, 219 F.3d 289, 297 (3d Cir. 2000) (collecting cases).

Probable cause can cease to exist if the information in an affidavit becomes too stale.  See United States v. Zimmerman, 277 F.3d 426, 434 (3d Cir. 2002).  The age of the information, however, must be analyzed together with the "'nature of the crime and the type of evidence.'" Id. (quoting United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983)).  If the affidavit avers facts indicating "protracted or ongoing" criminal acts, the information's age becomes less important.  United States v. Henley, 941 F.3d 646, 653 (3d Cir. 2019) (citing United States v. Urban, 404 F.3d 754,

774-75 (3d Cir. 2005)).  Protracted and ongoing criminal acts are "inherent in a

large-scale narcotics operation." United States v. Harris, 482 F.2d 1115, 1119 (3d Cir.

1973).

We begin our analysis by setting forth, in summarized fashion, the pertinent

portions of the lengthy and detailed February 1, 2018 affidavit of probable cause.  In

that affidavit, Trooper Panchik avers as follows:

- Trooper Panchik had extensive experience with drug investigations and arrests, as well as specialized education and training in the fields of drug trafficking and enforcement.  (Doc. 63-1 at 3).

- Trooper Panchik had significant experience working with cooperating defendants and CIs in investigating and prosecuting drug-trafficking conspiracies.  (Id. at 4).

- In 2012, Trooper Panchik and other law enforcement agencies received information from five separate confidential sources that Williams was distributing cocaine in large quantities around the Harrisburg area.  One source stated that Letterlough helped Williams source cocaine from North Carolina.  (Id.)

- Trooper Panchik was aware that Williams' brothers had been arrested and imprisoned in 2015 and 2016.  Trooper Panchik believed Williams' brothers assisted in distribution, and their incarceration forced Williams herself to become more involved and "hands-on" in cocaine distribution in 2016.  (Id. at 4, 5).

- In August 2016, Trooper Panchik "began an investigation into Saqueena Williams [a.k.a.] Queenie and her cocaine distribution in and around Harrisburg City."  (Id. at 5).

- On August 18, 2016, Trooper Panchik debriefed a CI ("CI #1") who stated they had purchased cocaine from a woman known as "Queenie" throughout 2016.  Six days later, on August 24, 2016, Trooper Panchik used this CI to set up a controlled buy of cocaine from Williams in Harrisburg.  A woman identified as Williams exited 1936 Rudy Road before the transaction, and returned to it immediately after.  (Id. at 5-6).

- The next day, on August 25, 2016, Trooper Panchik obtained a court order to geolocate the cell phone number used to communicate with Williams for the controlled buy.  Geolocation results from this court order confirmed that Williams often stayed overnight at the Rudy Road location. Trooper Panchik also referenced "open source information" noting that Williams had resided at the Rudy Road address since 2005.  (Id. at 5, 6).

- Geolocation results informed Trooper Panchik that Williams also spent nights at the Bradley Drive location.  Trooper Panchik learned that Williams' mother, Rosheema Davis, owns the Bradley Drive residence.  In 2016 and 2017, both surveillance and a confidential source confirmed to Trooper Panchik that Williams frequented the Bradley Drive residence alone.  (Id. at 7, 9).

- On September 14, 2016, Trooper Panchik observed an electric maintenance van parked at the Bradley Drive address and confirmed through geolocation that Williams' cell phone was at the residence. Trooper Panchik coordinated with Sergeant Reber to contact Williams while she was at the Bradley Drive location.  Sergeant Reber knocked on the front door, and Williams emerged from the garage. When Sergeant Reber asked Williams for her name, she claimed to be Rosheema Davis. When he asked for contact information, she claimed to have just recently moved into the Bradley Drive residence and therefore had no telephone number to provide to him.  (Id. at 7, 8).

- Due to his experience and training, Trooper Panchik knew that sophisticated drug traffickers utilize various addresses to elude detection and will not keep illicit items at a location known to police.  He believed Williams was a "sophisticated narcotics trafficker" who showed common signs of activities meant to "limit [her] exposure" to competitors and law enforcement.  (Id. at 8).

- In October 2016, Trooper Panchik spoke to another CI ("CI #2"), who claimed Williams stored cocaine and money at Letterlough's Kensington Street residence.  (Id. at 8-9).

- In August 2017, Trooper Panchik conducted a "trash pull" at the Bradley Drive residence.  No drugs or paraphernalia were recovered.  Three weeks later, video surveillance identified Williams as she brought a small trash bag to the curb and observed garbage collection occur before leaving the residence.  Williams' odd behavior in personally handing trash to the collector led Trooper Panchik to believe that Williams had discovered his previous pull and was taking steps to prevent a further trash pull.  (Id. at 9, 10).

- On October 2, 2017, Trooper Panchik used CI #1 to call Williams for another controlled buy of cocaine. Minutes before the transaction, surveillance observed Williams leave the Rudy Road residence. Immediately after the transaction, surveillance observed Williams meeting up with Letterlough. Trooper Panchik believed that Letterlough met with Williams to obtain the funds from the controlled buy. (Id. at 10-11).

- In September 2017, October 2017, and January 2018, surveillance continued to observe Williams and her vehicles at both the Bradley Drive and Rudy Road residences for hours at a time. (Id. at 10, 11, 12).

- On January 31, 2018, Trooper Panchik spoke with another CI ("CI #4")[3] who previously claimed to have purchased two to three kilograms of cocaine from Williams and Letterlough in 2015. The following day, Trooper Panchik set up a third controlled buy with the goal of arresting Williams onsite. (Id. at 12).

- On February 1, 2018, Trooper Panchik executed the undercover operation. After CI #1 contacted Williams to purchase cocaine, surveillance observed Williams exit the Rudy Road location, drive to the Kensington Street location, and exit the Kensington Street location less than 10 minutes later. Williams then drove to the meet location, where she was detained by Pennsylvania State Police. Troopers searched Williams and found three ounces of cocaine on her person. (Id.)

Based upon his affidavit, Trooper Panchik applied for, obtained, and executed search warrants for the Rudy Road, Bradley Drive, and Kensington Street residences.

Williams principally claims that the affidavit contained "stale information" based on the historical information that Trooper Panchik provided regarding Williams, her family members in prison, and the lapse in time between the three controlled buys. (See Doc. 63 ¶¶19-38; Doc. 64 at 2, 3, 8-10; Doc. 73 at 23-26). She also obliquely attacks the reliability of the information provided by the CIs because

---

[3] The affidavit does not reference a CI #3. (See Doc. 76 at 6).

the affidavit did not include averments regarding their reliability.  (See Doc. 63 ¶ 40;
Doc. 64 at 9).  She finally argues that Trooper Panchik's affidavit failed to establish
the necessary nexus between criminal activity and the Rudy Road and Bradley
Drive locations.  (See Doc. 63 ¶¶ 41-47; Doc. 64 at 10-11).

Williams' piecemeal approach to the facts of the affidavit fails to acknowledge
that probable cause is a holistic, totality-of-the-circumstances assessment.  See
Miknevich, 638 F.3d at 182 (3d Cir. 2011) (citing Gates, 462 U.S. at 238-39).  The age
of some of the historical information provided by Trooper Panchik[4] does not
diminish the relevance of two completed controlled buys and a third controlled buy
event, which led to a lawful arrest of Williams with three ounces of cocaine on her
person.  (See Doc. 63-1 at 12; Doc. 69 at 6).  Trooper Panchik's first paragraph
describing his investigation into Williams' notes that five different confidential
sources provided information in 2012, claiming Williams ran "a large-scale cocaine
(powder and crack cocaine) distribution network in Harrisburg City."  (Id. at 4).
Subsequent pages describe multiple CIs who confirmed these claims in 2016, 2017,
and 2018.  (Id. at 5-12).  His affidavit describes a years-long investigation into
"protracted and ongoing" drug trafficking, meaning the age of any particular fact
loses its importance.  See Harris, 482 F.2d at 1119; see also Henley, 941 F.3d at 653.

---

[4] It is readily apparent that certain background information was provided not
to support probable cause, but for historical purposes to explain Trooper Panchik's
familiarity with relevant parties.  His affidavit explicitly states that he did not begin
a formal investigation into Williams until August 2016.  (See Doc. 63-1 at 5, 21).

Williams also ignores that the probable-cause analysis includes, but is *not* limited to, "the veracity and basis of knowledge of persons supplying hearsay information." See Gates, 462 U.S. at 238 (internal quotation marks omitted). Williams correctly observes that the first confidential tips came in years before Trooper Panchik sought warrants for Rudy Road and Bradley Drive, and that he failed to mention CI reliability explicitly. Williams' selective recitation of the facts, however, ignores that Trooper Panchik verified the reliability of his CIs through controlled buys which confirmed Williams was trafficking cocaine. The controlled buys reinforced the claims of Trooper Panchik's CIs, and provided ample probable cause to search residences that were connected to Williams and believed to contain drug-trafficking contraband. See United States v. Stearn, 597 F.3d 540, 558-59 (3d Cir. 2010) (explaining that, for drug-trafficking offenses, no direct evidence is required to find probable cause to search a defendant's residence).

Williams nexus argument fails for the same reason. Although Williams claims the affidavit does not adequately establish the connection between the alleged crimes and the Rudy Road and Bradley Drive residences, (see Doc. 64 at 10-11; Doc 73 at 23-26), this assertion is conclusively rebutted by Trooper Panchik's affidavit. We discuss each location *seriatim*.

1936 Rudy Road was Williams' long-time residence. (See Doc. 63-1 at 5, 13). She was observed leaving this residence immediately before the August 2016 controlled buy and returning to it immediately afterwards. (Id. at 6). She was observed leaving the Rudy Road residence minutes before the October 2017 controlled buy. (Id. at 11). Cell phone geolocation information obtained through a

court order confirmed she spent nights there.  (Id.)  Williams argues that because
Trooper Panchik never personally observed her "entering the residence[] with
contraband or large bags," that no nexus to Rudy Road exists.  (Doc. 64 at 11).
Direct evidence of nexus, such as personal observation, is plainly not required by
our court of appeals.  See Stearn, 597 F.3d at 554.  To the contrary, there are "many
factors that may help establish the required nexus," see id. at 559, and Trooper
Panchik's affidavit identified several of them.  Specifically, his affidavit contains
facts about Williams running a "large-scale operation," multiple controlled buys, an
"attempt to evade officers' questions" about her identity and address, "probable
cause to arrest [Williams] on drug-related charges," and the conclusions of Panchik,
an experienced officer, regarding where evidence of the trafficking might be found.
See id. at 559-60 (listing factors).  These factors are more than sufficient to allow a
magistrate to draw a reasonable inference that evidence of drug-trafficking could be
located at 1936 Rudy Road.

Williams' arguments regarding Bradley Drive fare no better.  While 1855
Bradley Drive was not Williams' residence, she was connected to Bradley Drive by
direct observation of law enforcement, (Doc. 63-1 at 8), by video surveillance, (id. at
10), by tips from confidential informants, (id. at 9), by cell phone geolocation, (id. at
7), and by statements from Williams herself--when she provided a false name to
Sergeant Reber, telling him she had "just moved in" to Bradley Drive, (id. at 8).
Trooper Panchik reasonably inferred that Williams gave false information to
distance herself from the Bradley Drive location, in an attempt to elude competitors
and law enforcement.  (Id.)  In addition, Williams spent overnights at the Bradley

Drive residence, was present when repairs were being done to the home, and even brought out the garbage.  This substantial evidence of Williams' association with the residence—particularly when coupled with her evasive behavior and falsely identifying information, the existence of probable cause that Williams was trafficking drugs, and Trooper Panchik's averments regarding a sophisticated and large-scale operation—is more than sufficient to provide a nexus between the alleged crimes and 1855 Bradley Drive.  See Stearn, 597 F.3d at 559-60.

In sum, Williams' fractured approach to Trooper Panchik's affidavit is inconsistent with settled Fourth Amendment principles.  Under the totality of the circumstances, we have no doubt that the detailed and thorough 13-page affidavit provided "a substantial basis for . . . concluding that probable cause existed." Miknevich, 638 F.3d at 182 (alteration in original) (quoting Gates, 462 U.S. at 238-39).  Because we find that the affidavit contained sufficient information for a magistrate to conclude that probable cause existed, we need not address Williams' good-faith argument.

## 2.  *Cell Phone Warrant for Kensington Street*

Williams also asserts that the April 2018 affidavit for a search of six cell phones recovered from the Kensington Street address is void as a general warrant. Williams initially contended that this warrant could not be used to search phones seized from the Bradley Drive address.  (See Doc. 63 ¶¶ 48-51; Doc. 64 at 12-14).  The government responded that no phones from Bradley Drive were searched, and that phones from Letterlough's residence on Kensington Street were searched but had long been out of use.  (See Doc. 69 at 7-8).  In both its brief and at the suppression

hearing, the government provided 2014 as the last date of activation for the phones. (Id.; Doc. 76 at 11).  Finally, the government noted one of the phones seized from the Kensington Street address seems to have been used by Williams, because text messages sometimes referred to the recipient as "Q."  (Id.)

Williams now contends that she has a privacy interest in five of the six phones from Kensington Street, not Bradley Drive, that were subject to search under the April 2018 cell phone warrant.  (See Doc. 73 at 13-22; Doc. 73-1; Doc. 79 at 7-9).  The government characterizes Williams' newfound request as untimely, since the Kensington Street cell phones were not the subject of her initial motion, and asks us to deny it on that basis.  (See Doc. 76 at 10).  The government further argues that Williams' asserted expectation of privacy in the Kensington Street phones is unreasonable.  (Id. at 12-18).

Fourth Amendment analysis traditionally begins with examining whether the defendant possessed a reasonable expectation of privacy in the object or place being searched.  See Kyllo v. United States, 533 U.S. 27, 27-28 (2001); Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  An individual who lacks a reasonable expectation of privacy in a place cannot invoke Fourth Amendment protection.  See United States v. Perez, 280 F.3d 318, 337 (3d Cir. 2007).  Merely claiming ownership over property is not sufficient, because property law concepts inform, but do not control, the Fourth Amendment analysis.  See Rawlings v. Kentucky, 448 U.S. 98, 105 (1980) (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)); United States v. Burnett, 773 F.3d 122, 132 (3d Cir. 2014).  Indeed, when the property or area searched "is in the control of a third party," an individual lacks a

reasonable expectation of privacy in that property or area.  Gov't of Virgin Islands v. Williams, 739 F.2d 936, 938 (3d Cir. 1984) (citing Rakas, 439 U.S. at 133-34).  In other words, a defendant aggrieved by the introduction of damaging evidence obtained from an illegal search of a third party's property or premises suffers no Fourth Amendment infringement.  Rakas, 439 U.S. at 133-34; United States v. Baker, 221 F.3d 438, 442 (3d Cir. 2000).  A defendant must show both that she *subjectively* had an expectation of privacy in the place or property searched, and that society *objectively* would accept that expectation as reasonable.  See Rakas, 439 U.S. at 143 & n.12; United States v. Donohue, 764 F.3d 293, 298-99 (3d Cir. 2014).

Overnight guests "legitimately" in a third-party's home may have a reasonable expectation of privacy therein.  Perez, 280 F.3d at 337 (citing Minnesota v. Olson, 495 U.S. 91, 98-99 (1990)).  The law distinguishes between overnight guests (who reasonably expect a degree of privacy) and transient visitors at a third party's property (who do not).  See Minnesota v. Carter, 525 U.S. 83, 90 (1998); see also United States v. Rose, 613 F. App'x 125, 129 (3d Cir. 2015) (nonprecedential) (holding no expectation of privacy for a social guest at the apartment of a long-time friend).  In most cases, a person's "status as an overnight guest is alone enough to show that [she] had an expectation of privacy in the home."  Olson, 495 U.S. at 96-97.  Several factors guide this assessment, including, *inter alia*, whether and how often the person spent the night, whether the person had a key, whether the person received mail at the property, and whether the person stored personal belongings or overnight accoutrements in the place.  See, e.g., United States v. Pettiway, 429 F. App'x 132, 133 (3d Cir. 2011) (nonprecedential); United States v. Edwards, No. 11-

735, 2013 WL 2256125, at *10 (E.D. Pa. May 23, 2013); <u>United States v. Henry</u>, No. 11-30, 2012 WL 2886204, at *5-6 (D.V.I. July 15, 2012); <u>United States v. Mitchell</u>, No. 10-CR-114, 2010 WL 3938235, at *4 (M.D. Pa. Oct. 4, 2010).  But it is beyond peradventure that "a co-conspirator's participation in an operation or arrangement that indicates joint control and supervision of the place searched," standing alone, cannot establish a legitimate expectation of privacy for Fourth Amendment purposes.  <u>United States v. Padilla</u>, 508 U.S. 77, 80, 82 (1993).

To support her claim of a privacy interest, Williams provides a signed affidavit, stating that she "owned, possessed, and used" five of the cell phones seized from the Kensington Street home and that she did not intend to abandon them there.  (<u>See</u> Doc. 73-1 ¶¶ 14-17).  She provides no other documentation or information in support of this assertion.  Arguing that her affidavit establishes a reasonable expectation of privacy, Williams claims that any evidence obtained from these five phones must be suppressed because the warrant authorizing a search of the phones was void as a general warrant.

We simply cannot credit this affidavit from Williams as establishing an objectively reasonable expectation of privacy in the phones seized from the Kensington Street location.  Williams provides the court nothing other than a bare assertion that she owned five of the deactivated cell phones at some point in time.  She provides no objective information to back her claims, such as a receipt of purchase or a previous cell phone bill.  She provides no timeline to the court for when she last used any of these phones.  She does not claim any attempt to label the bag in which four of them were found, or to secure their locations.  And she does

not aver that she took other proactive steps to maintain dominion and control over them. Cf. Riley v. California, 573 U.S. 373, 393-94 (2014) (finding expectation of privacy in cell phone seized *from defendant's person* during search incident to arrest). In sum, Williams claims that she left five deactivated cell phones at Letterlough's residence for some indeterminate period of time, and provides the court no other information about her purpose in doing so.

As the government correctly points out, Williams' initial motion (see Doc. 63) did not appear to express any interest in the Kensington Street residence at all, much less the phones seized therefrom, before learning that the government believed she may have used one of the cell phones in 2014. (See Doc. 76 at 4-5, 7). Notably, four of the six seized cell phones were located in Letterlough's basement, surrounded by contraband and drug-packaging paraphernalia. (See Doc. 69 at 8). Williams' argument that she was not in a position to provide *any* testimony regarding these phones at the suppression hearing (see Doc. 79 at 3-5) further belies her claim that she continued to maintain dominion and control over them at Letterlough's. (See Doc. 73-1 ¶¶ 16-17). It strains credulity to accept that Williams maintained an objectively reasonable expectation of privacy in years-old deactivated cell phones that she could not recognize, identify, or place without the assistance of discovery photographs and descriptors.

Williams also does not assert any privacy interest in the Kensington Street home. She does not aver to be an overnight guest, to have possessed a key, to have received mail there, or to have stored other personal belongings there. Cf. Olson, 495 U.S. at 98-99. In stark contrast, Trooper Panchik's affidavit portrays Williams'

association with Kensington Street as purely transactional: she often stopped by the house for minutes at a time before or after drug deals.  (See Doc. 63-1 at 8, 9, 11, 12, 13).  The affidavit also contains no geolocation information that places Williams' active cell phone at Kensington Street overnight.  We therefore conclude from the facts in the record that Williams was a transient visitor at the Kensington Street location.  She was "merely present with the consent of the householder," Letterlough, and did not have a reasonable expectation of privacy in the house or the items that were seized from it, including the deactivated cellphones.  See Carter, 525 U.S. at 90.  To the extent that Williams' claim rests on her participation as a coconspirator with Letterlough, any "joint control" she operated over Kensington Street also does not establish a legitimate expectation of privacy for Fourth Amendment purposes.  See Padilla, 508 U.S. at 80, 82.

We conclude that Williams did not have a reasonable expectation of privacy in the phones seized from Letterlough's residence on Kensington Street and thus has not identified a violation of her Fourth Amendment rights.  Accordingly, we do not reach Williams' subsequent arguments regarding the cell phone warrant.

### III.   Conclusion

We will deny Letterlough's and Williams' motions (Docs. 62, 63) to sever.  We will also deny Williams' motion (Doc. 63) to suppress evidence because she has

failed to identify a Fourth Amendment violation.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    December 29, 2020